# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Kathryn G. Kane,

      Plaintiff,

v.

Nancy A. Berryhill,
Acting Commissioner of Social Security,

      Defendant.

Case No. 17-cv-1002 (SER)

**ORDER**

---

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kathryn G. Kane ("Kane") seeks review of the Acting Commissioner of Social Security's ("Commissioner") denial of her application for social security income ("SSI") and disability insurance benefits ("DIB"). *See* (Compl.) [Doc. No. 2]. The parties filed cross-motions for summary judgment. (Mot. for Summ. J.) [Doc. No. 17]; (Def.'s Mot. for Summ. J.) [Doc. No. 19]. For the reasons set forth below, the Court grants Kane's Motion for Summary Judgment in part, denies the Commissioner's Motion for Summary Judgment and remands this case for further consideration consistent with this Order.

## I. BACKGROUND

### A. Procedural History

Kane protectively filed for SSI and DIB on December 18, 2013, citing an alleged onset date ("AOD") of March 1, 2008. (Admin. R.) [Doc. No. 12 at 145, 304, 305, 307]. Kane claimed disability due to a bipolar disorder, depressive disorder, generalized anxiety disorder,

posttraumatic stress disorder, and a personality disorder.[1] (*Id*. at 145–46). During evaluation for her other mental impairments, Kane also presented with borderline intelligence. *See, e.g.*, (*id*. at 469, 481, 1193–94). Kane's claim was denied initially and upon reconsideration. (*Id*. at 14). Following a hearing, the administrative law judge (the "ALJ") denied benefits to Kane on February 9, 2016. *See* (*id*. at 14–30). The Appeals Council denied Kane's request for review on March 3, 2017, rendering the ALJ's decision final. (*Id*. at 1–3); *see also* 20 C.F.R. § 404.981.[2] Kane initiated the instant law suit on March 31, 2017. (Compl.).

    B.    **Factual Background**

At the time of her AOD, Kane was twenty-eight years old which makes her a "younger person." (Admin. R. at 145); *see also* 20 C.F.R. § 404.1563(c). Kane did not complete high school, dropping out in the twelfth grade, but obtained her GED in 2000. *See, e.g.*, (Admin. R. at 40, 352).

    1.    **Testimony Before the ALJ**

    a.    **Kane**

Kane testified that she currently lives with her mother and five-year-old daughter. *See* (*id*. at 55–56). Kane testified that she lived with her mother for the first four years of her daughter's

---

[1] Kane also claimed disability related to a number of physical impairments. *See* (Admin R. at 146). These ailments, however, are not at issue in the instant case because Kane's challenge to the Commissioner's adverse disability determination relates to Kane's allegations of mental disability generally with specific emphasis related to the ALJ's determination regarding Listing 12.05. *See generally* (Mem. in Supp. of Summ. J., "Pl.'s Mem. in Supp.") [Doc. No. 18]. Consequently, the Court focuses on Kane's alleged mental impairments only. *See Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (stating the claimant waived issues not raised before the district court).

[2] Kane applied for both DIB and SSI, which each have a separate set of regulations. *See* 20 C.F.R. Pt. 404, Subpt. P; 20 C.F.R. Pt. 416, Subpt. I. The regulations referred to in this Order have parallel citations in each set of regulations. *Compare* 20 C.F.R. § 404.1520 *with* 20 C.F.R. § 416.920. For ease of reference, the Court will only refer to the regulations regarding DIB, 20 C.F.R. Pt. 404, Subpt. P.

life and that her mother helped raise her daughter. *See* (*id.* at 56). Kane also testified that at one point her mother moved out to live in a senior center, but Kane "couldn't do it" and so her mother moved back in to help with her daughter. *See* (*id.*). Kane testified that she receives $437 a month in general assistance, $400 of which she gives her mother as rent. *See* (*id.* at 56, 57). Kane also stated that she receives food stamps, but does not know the amount. (*Id.* at 56).

With respect to activities of daily living, Kane testified that she shops about once a month for groceries using the food stamps, routinely drives her daughter six blocks to school, and does not cook, although she can prepare TV dinners and toast. *See* (*id.* at 57–59). Kane stated that her daughter is becoming more independent and tends to some of her own self-care needs like getting food or making a sandwich. *See* (*id.* at 58). Kane stated that she does not clean, or do the dishes, but can do the laundry with help from her daughter. (*Id.* at 60). When home, Kane rarely watches TV or reads. *See* (*id.* at 61). When home with her daughter, they play with dolls, and Kane sings her the "ABCs." *See* (*id.* at 62–63).

Kane's longest lasting employment before her AOD lasted approximately three years when she performed automobile oil changes. *See* (*id.* at 44). Kane stated she was fired because she was not good with money or customers. *See* (*id.*). After her AOD, Kane testified that she worked in a limited capacity: being cast in a television commercial and working for her brother in the food industry loading trucks. *See* (*id.* at 43–45). Kane stated that while she worked with her brother, her mother would not let her waitress because she "didn't get along with people." (*Id.* at 45).

At various times throughout Kane's testimony, the ALJ admonished Kane for not answering the questioned asked, failing to allow the ALJ to finish her question, or answering the question in a manner that was not helpful to the ALJ. *See, e.g.*, (*id.* at 58, 59, 60, 62). Kane also

testified that her mother helped her pass her GED exam. *See* (*id.* at 69–70). Specifically, Kane alleges that she was able to call her mother using her cell phone to obtain answers on math related questions while the proctor was distracted "doing . . . artsy craftsy stuff at her desk." *See* (*id.* at 68–70).

### b. Kane's Mother

Kane's mother testified that she helps "a lot" with the care of both Kane and Kane's daughter. *See* (*id.* at 86). For example, Kane's mother testified that Kane

> runs out of food money, so the last two weeks of the month, I buy food and I pay insurance on her car, . . . buy clothes for both [Kane and her daughter] and all the necessities, . . . welfare doesn't provide toilet paper and pop and things like that, so I do my best.

(*Id.* at 86). Furthermore, Kane's mother stated that Kane was not capable of tending to her own personal care completely and that Kane was often reminded to shower, for example. *See* (*id.* at 86–87). Kane's mother also corroborated Kane's testimony that she provided help over the phone during her GED examination because she "wanted her to get a diploma" and provided help with the "math and history questions." (*Id.* at 89).

### 2. Medical Evidence[3]

### a. Stephen J. Antonello

Stephen J. Antonello, PhD ("Dr. Antonello"), conducted his first psychological evaluation of Kane on May 11, 2011. *See* (*id.* at 477–86) (Dr. Antonello's first report). Dr. Antonello conducted a second psychological evaluation of Kane on January 7, 2014. *See* (*id.* at 465–76) (Dr. Antonello's second report). During both interviews Kane presented with a

---

[3] The Court has reviewed the entire administrative record but summarizes only the evidence necessary to provide context for the issues before the Court, specifically as they related to the ALJ's determination that Kane's condition did not meet, and was not medically equivalent to, Listing 12.05. *See generally* (Pl.'s Mem. in Supp.). As stated above, the Court focuses on these determinations in its analysis.

depressed affect. *See* (*id.* at 466) (presented with "a depressed emotional affect"); (*id.* at 478) (presented with a "dull and depressed emotional affect"). Dr. Antonello's opinions are largely consistent between the two evaluations. For example, Dr. Antonello concluded that Kane suffers from "[m]ajor depression"; "[p]osttraumatic stress disorder"; "social, generalized, obsessive, and panic anxiety"; "[b]oderline personality disorder"; "[a]voidant personality disorder"; and "[b]orderline intellectual functioning." *See* (*id.* at 471, 482–83). Furthermore, Dr. Antonello opined that Kane was not capable of working an eight-hour work day, was "likely to have marked difficulty maintain social functioning, and marked difficulty maintaining concentration, persistence, and pace of activities." *See* (*id.* at 473, 485). In support of these opinions, Dr. Antonello stated that Kane's depression, anxiety, posttraumatic stress disorder, and personality disorder are likely to cause her marked difficulty and ultimately work to reduce her employability. *See* (*id.* at 472, 484).

The primary difference in the psychological evaluations center around results from objective tests, particularly Weschler Adult Intelligence Score–3rd Edition ("WAIS-III")[4] test results and Wide Range Achievement Test-3 ("WRAT-3")[5] test results. The Court addresses each of these tests below.

### i. First Tests

During the 2011 interview, Kane admitted to prior substance abuse, including cannabis and cocaine dependency. *See* (*id.* at 481). Kane stated that she had not used cannabis or cocaine

---

[4] As is mentioned below, before the WAIS-IV test, the WAIS-III test was "the standard instrument in the United States for assessing intellectual functioning." *Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002).

[5] "The Wide Range Achievement Test measures basic academic skills including word reading, sentence comprehension, spelling and math computation." *Hooey v. Astrue*, No. 11–CV–2805 (JRT/TNL), 2012 WL 5830402, at *2 n.3 (D. Minn. Oct. 12, 2012) (Leung, Mag. J.), *adopted by*, 2012 WL 5833271 (D. Minn. Nov. 16, 2012) (Tunheim, J.).

5

for the last two years. (*Id.*). Furthermore, Kane stated that she lived with her mother, spent money she did not have, and would occasionally disappear, leaving her mother to care for her daughter. *See* (*id.* at 478, 480). Kane demonstrated a verbal IQ of seventy-eight, a performance IQ of sixty-nine, and a full scale IQ of seventy-two. (*Id.*). At no point did Dr. Antonello state or otherwise suggest that Kane's drug use was a mitigating factor in her scores. *See generally* (*id.* at 477–86). As part of his assessment, Dr. Antonello opined that Kane's "verbal and performance measures reflect a significant discrepancy in favor of the verbal scores." (*Id.* at 481). Furthermore, Dr. Antonello stated that Kane "persist[ed] adequately on difficult tasks." (*Id.* at 477). The WRAT-3 test that Dr. Antonello administered yielded results suggesting that Kane read at an eighth-grade level and had arithmetic skills at the fourth-grade level. *See* (*id.* at 482).

### ii.    Second Tests

During the 2014 interview, Kane again admitted to prior substance abuse, including cannabis, cocaine, methamphetamines, and mushrooms. (*Id.* at 469). Kane stated she had not used cannabis for approximately two years and abstained from the other substances for approximately six years. *See* (*id.*). Kane stated that she lived in a duplex with her dog and daughter and that she "is able to drive her own vehicle." (*Id.* at 468). During the 2014 assessment, Kane demonstrated a verbal IQ of sixty-seven, a performance IQ of sixty-three, and a full scale IQ of sixty-three. (*Id.* at 469). This time, Dr. Antonello concluded that "[t]here is no significant discrepancy between the verbal and performance measures." (*Id.*). Dr. Antonello also opined that that Kane "gives up too easily on difficult tasks" because she is easily stressed. *See* (*id.* at 465). As a result, Dr. Antonello believed Kane's scores "underestimate [her] true cognitive ability, which likely falls within the borderline range of ability." (*Id.* at 469). Again, at no point did Dr. Antonello state or otherwise suggest that Kane's drug use was a mitigating factor in her

scores. *See generally* (*id.* at 465–76). The WRAT-3 test that Dr. Antonello administered during the 2014 evaluation yielded a reading score at the sixth-grade level and an arithmetic score at the second-grade level. *See* (*id.* at 470).

### b. Natalis Tests[6]

The Natalis doctors issued their report in August of 2015, after conducting tests in July and August of that year. *See* (*id.* at 1190). During the interview with the Natalis doctors, Kane "did not provide any information specifically addressing her history of [substance] use." (*Id.* at 1192). As part of their evaluation, the Natalis doctors administered a WAIS-IV test to measure Kane's intelligence.[7] (*Id.* at 1193). On the WAIS-IV test, Kane demonstrated a full scale IQ score of fifty-seven. (*Id.*). Assigned to their respective component parts, this represented a verbal comprehension index of 70, a perceptional reasoning of 63, working memory of 53, and a processing speed of 65. *See* (*id.* at 1193–94). As part of the results, the Natalis doctors opined that Kane's scores do not suggest that she "is unable to engage in many of the required activities of daily living; rather, it suggests that Ms. Kane may struggle a great deal with her ability to organize and strategize her behaviors, and may be easily distracted, becoming quickly overwhelmed." (*Id.* at 1194). Furthermore, the Natalis doctor's observed:

> Ms. Kane's best performance on the WAIS-IV was on tasks related to her ability to use verbal problem-solving strategies. Her VCI score suggests that her ability in areas involving verbal information, such as analogies, and

---

[6] The report at issue was co-signed by both Julie A. Vandermay, PsyD, MA ("Dr. Vandermay"), and Monique R. Lowe, PhD, LP ("Dr. Lowe"). *See* (*id.* at 1211). It is unclear from the record which portions of the report were authored by whom. As a result, the Court refers to Doctors Vandermay and Lowe as "the Natalis doctors," the report as the "Natalis report," and tests conducted as "Natalis tests," because the tests were administered by Natalis Psychology. *See* (*id.* at 1190).

[7] The WAIS-IV represents improvements over the WAIS-III. *See* Gordon E. Taub, PhD & Nicholas Benson, PhD, *Matters of Consequence: An Empirical Investigation of the WAIS-III & WAIS-IV & Implications for Addressing the Atkins Intelligence Criterion*, 13 J. of Forensic Psychol. Prac. 27, 27, 30–31 (2013).

comprehension, are a significant strength for her at this time as she outperforms 2% of her same aged peers; however, her performance during these tasks was not contingent on her ability to process and encode/retrieve presented material in a limited amount of time. In other words, Ms. Kane was not given time restrictions and this may have helped her to achieve a better score as she would become quite anxious and overwhelmed on tasks in which she was timed or given a limited amount of time to complete them.

(*Id.*). The Natalis doctors diagnosed Kane with "Bipolar Disorder, Unspecified"; "Posttraumatic Stress Disorder"; "Anxiety States"; "Unspecified Persistent Mental Disorders due to Conditions Classified Elsewhere"; and "Schizoid Personality Disorder with Features of Borderline Personality Disorder." (*Id.* at 1211). Furthermore, the Natalis doctors noted that Kane "demonstrated significant problems with learning and memory" and her "performance . . . suggests that she has profound cognitive difficulties." (*Id.* at 1207).

### 3. ALJ's Decision

On February 8, 2016, the ALJ issued a decision concluding that Kane was not disabled after conducting a five-step analysis prescribed by 20 C.F.R. § 404.1520(a)-(g). (*Id.* at 14–30).

At step one, the ALJ determined that Kane had not engaged in substantial gainful activity as of the AOD. *See* (*id.* at 17). At step two, the ALJ found Kane to have the following severe mental impairments: "bipolar disorder vs. depression, personality disorder, attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), and alcohol, cannabis, and cocaine dependence." (*Id.*).

At step three, the ALJ considered Listings 12.02 (organic mental disorders), 12.04 (affective disorders), 12.05 (intellectual disability), 12.06 (anxiety related disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders). *See* (*id.* at 19). The ALJ concluded that Kane's impairments did not meet, or medically equal, the criteria of these Listings. *See* (*id.* at 19). Specifically, with respect to Listing 12.05, the ALJ concluded that Kane

8

did not meet paragraph A of Listing 12.05 because there was no evidence in the record to support a finding that Kane was dependent upon others for her personal needs. *See* (*id.* at 21); *see also* C.F.R., Pt. 404, Subpt. P, App. 1 § 12.05A.[8]

The ALJ also concluded that the paragraph B criteria were not met because Kane "does not have a valid verbal, performance, or full scale IQ of 59 or less." (*Id.* at 21). With respect to the Natalis tests, the ALJ discounted the results because: the Natalis report "does not give any indication that they were aware of the earlier IQ testing, which may have resulted in some questions about the validity of this testing"; the Natalis report "does not clearly state that the results were believed to be an accurate indication of [Kane's] functioning"; "the result was based on incomplete information provided by the claimant, including information on substance abuse"; and "the examiner did not diagnose any type of cognitive disorder following the testing." (*Id.* at 22).

Next, the ALJ concluded that Kane did not meet paragraph C of Listing 12.05. That is, for many of the same reasons stated above, the ALJ concluded that Kane "does not have a valid verbal performance, or Full Scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (*Id.*). Specifically, "[g]iven the earlier estimations of borderline intelligence and the lack of clear validity of the later testing," the ALJ concluded that Kane "has a borderline IQ rather than an intellectual disability under 12.05 C." (*Id.* at 22). Finally, the ALJ concluded that Kane did not meet paragraph D of Listing 12.05. *See* (*id.* at 21, 22). Specifically, the ALJ stated that Kane could not meet the paragraph D criteria because the record did not reflect marked limitations regarding

---

[8] The Listings were amended after the ALJ's decision. The Court references the Listings that were effective at the time of the ALJ's decision on February 9, 2016. *See* C.F.R., Pt. 404, Subpt. P, App. 1 (2015) (effective August 12, 2015 to May 23, 2016).

9

activities of daily living, maintaining social function, maintaining concentration, persistence, or pace, or suggested repeated episodes of decompensation. *See* (*id.* at 21). In addition, the ALJ stated the fact Kane could not meet paragraph C's criteria for a valid IQ score in the range of 60 to 70 also prevented a finding of disability under the paragraph D criteria. *See* (*id.* at 22).

At step four, the ALJ analyzed Kane's RFC. (*Id.* at 22–28). The ALJ found that Kane had the RFC

> to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), which does not involve overhead work or power gripping, exposure to high concentrations of air pollutants, more than occasional kneeling, crawling, or crouching, which is routine, repetitive simple work, not requiring any public contact or more than brief, infrequent, or superficial contacts with co-workers and supervisors, defined as no less than an 8 in terms of the people rating in the DOT/SCO, and which is low stress, defined as no more than routine changes in the work process or work setting.

(*Id.* at 22).

At step five, the ALJ concluded that Kane is not capable of past relevant work. *See* (*id.* at 28–29). The ALJ found, however, that—consistent with the RFC—Kane could work other jobs that exist in significant numbers in the national economy, including an inserter, inspector, and garment bagger. (*Id.* at 29). As part of this determination, the ALJ found that Kane "has at least a high school education." (*Id.*).

## II. DISCUSSION

Kane argues that she is entitled to summary judgment for two reasons: (1) the ALJ erred when considering Kane's impairments under paragraph C of Listing 12.05; and (2) the ALJ erred when considering whether Kane's impairments "met or equalled [sic] a combination of Listings 12.02, 12.04, 12.06, and 12.08." (Pl.'s Mem. in Supp. at 4–14). The Commissioner argues that Kane failed to meet her burden demonstrating disability under Listing 12.05 and that the ALJ did not err evaluating Kane under Listings 12.02, 12.04, 12.06, and 1208. (Def.'s Mem. in Supp. of

Mot. for Summ. J., "Def.'s Mem. in Supp.") [Doc. No. 20 at 6–18]. The Court concludes that remand is warranted because unaddressed inconsistencies in the record as a whole prevent this Court from determining whether substantial evidence supports the ALJ's determination under Listing 12.05.

### A.   Legal Standard

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by substantial evidence in the record as a whole." *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (internal quotation marks omitted). The Court's task is limited "to review[ing] the record for legal error and to ensur[ing] that the factual findings are supported by substantial evidence." *Id.* This Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).

A court cannot reweigh the evidence or "reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [a court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999). That said, "remand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008).

### B.   Analysis

With respect to Listing 12.05, Kane only challenges the ALJ's decision regarding here paragraph C determination. *See* (Pl.'s Mem. in Supp. at 4–11). Thus, the Court limits its analysis

to the ALJ's determination regarding Listing 12.05C. *Cf. Hepp*, 511 F.3d at 806. To that end, the Court finds a number of inconsistencies in the record regarding the various test results that are inadequately explained by the ALJ. This prevents the Court from conducting a proper analysis to determine whether substantial evidence in the record supports that ALJ's conclusion and a remand is warranted. *Cf. Scott*, 529 F.3d at 822. Because the Court determines that remand is warranted based on the ALJ's conclusions with respect to Listing 12.05, the Court does not address Kane's arguments with respect to the other Listings.

The ALJ's decision regarding whether Kane met or medically equaled paragraph C of Listing 12.05 compares results of the tests conducted by Dr. Antonello and the Natalis doctors. *See* (*id.* at 20, 21–22). In comparing the first and second tests conducted by Dr. Antonello, the ALJ gave the second test no weight because the Dr. Antonello opined that it underestimated Kane's true cognitive ability. Notwithstanding the somewhat conclusory nature of Dr. Antonello's opinion, the ALJ appears to have taken Dr. Antonello's opinion at face value without weighing the evidence. Importantly, there is evidence in the record that suggests that Kane's lack of effort as perceived by Dr. Antonello is a function of Kane's severe impairments. For example, Natalis doctors intentionally removed timing constraints in some of their testing because the Natalis doctors concluded that timing Kane was problematic given her psychological impairments. *See* (*id.* at 1194). The ALJ concluded that Kane suffered from a number of severe mental impairments including "bipolar disorder vs. depression, personality disorder, attention deficit hyperactivity disorder (ADHD), [and] posttraumatic stress disorder (PTSD)." (*Id.* at 17). That is, consistent with the ALJ's conclusion, the Natalis doctors found that Kane would "become quite anxious and overwhelmed on tasks in which she was timed or given a limited amount of time to complete them." (*Id.* at 1194). As a result, the Natalis doctors removed these

timing constraints in an attempt to better approximate Kane's intellectual functioning. *See* (*id.*). But at no point did the ALJ attempt to reconcile Dr. Antonello's testing approach and his statement that Kane "tends to give up too easily on difficult tasks" with the testing approach and findings of the Natalis doctors. *Compare* (*id.* at 465), *with* (*id.* at 1194). Instead, the ALJ offered conclusory statements that the weight of evidence supports one result over another. *See* (*id.* at 20) ("Resolving conflicts in the record, the weight of the evidence is consistent with the claimant having at most 'moderate' limitations maintain concentration persistence or pace."). Given the unaddressed inconsistences in the record in this regard, the Court cannot say with certainty that the ALJ's opinion with respect to a comparison of Dr. Antonello's first test results with Dr. Antonello's second test results is supported by substantial evidence in the record.

With respect to the Natalis test, the ALJ gave it no weight because the Natalis test: "does not give any indication that they were aware of the earlier IQ testing, which may have resulted in some questions about the validity of this testing"; the Natalis report "does not clearly state that the results were believed to be an accurate indication of [Kane's] functioning"; "the result was based on incomplete information provided by the claimant, including information on substance abuse"; and "the examiner did not diagnose any type of cognitive disorder following the testing." (*Id.* at 22). Additionally, the ALJ seems to discount the Natalis test results because during Kane's examination, the Natalis doctors rejected as invalid a Minnesota Multiphasic Personality Inventory Section Edition test ("MMPI-2") that Kane completed. *See* (*id.* at 20); *see also* (*id.* at 1204). Each of the findings regarding the Natalis test is not supported by substantial evidence.

First, The ALJ does not explain why results from one objective test would be useful in assessing the accuracy of a separate objective test, and the Court is unaware of any regulation or Eighth Circuit holding that would necessitate such a finding. It is also unclear why the results of

13

a WAIS-III test (administered by Dr. Antonello) would necessarily be informative when reviewing results of a WAIS-IV test (administered by the Natalis doctors), and the ALJ is silent on this issue as well.[9] Thus, without more information, this Court cannot conclude that substantial evidence supports the ALJ's finding in this regard.

Second, the ALJ's conclusion that the Natalis report "does not clearly state that results were believed to be an accurate indication of [Kane's] functioning" is not supported by the record evidence. *Cf.* (*id.* at 22). Specifically, the ALJ found Dr. Antonello's reports to meet this criterion of the Listing. *See* (*id.* at 21–22). But there is nothing materially different in the manner in which Dr. Antonello's first report conveys its results and the manner in which the Natalis report conveys its results. That is, neither report specifically and unequivocally states that the results are an accurate reflection of Kane's functioning. *Compare* (*id.* at 477–86), *with* (*id.* at 1190–1212). In fact, Dr. Antonello's first report (which the ALJ apparently found sufficient) and the Natalis report (which the ALJ found insufficient) include very similar conclusions, notwithstanding the difference in the raw IQ scores. For example, Dr. Antonello opined that Kane's "verbal and performance measures reflect a significant discrepancy in favor of the verbal scores." (*Id.* at 481). This statement provides similar clarity to and is consistent with the Natalis

---

[9] Neither the ALJ nor the parties addressed the differences between the WAIS-III and the WAIS-IV tests. This Court, however, is aware of literature suggesting that WAIS-IV scores are generally more accurate. *See, e.g.*, Taub & Benson, *supra* at 46–47 (concluding that "legal professionals should assign more weight to the FSIQ obtained from the WAIS-IV and consider it to provide a score that is more valid, reliable, and consistent with the publisher's theoretical model to measure intelligence when compared to the WAIS-III's FSIQ."); *see also* Order Dated May 16, 2017, *Taylor v. Berryhill*, No. 16-cv-1408 (SER) [Doc. No. 18 at 6 n.4] (Rau, Mag. J.) (citing Taub & Benson, *supra*).

This Court does not base its remand determination on this fact because it was not raised by the parties. *Cf. Hepp*, 511 F.3d at 806. That said, because the WAIS-IV tests are generally considered more accurate, it does not necessarily follow that the Natalis doctors would have been skeptical of the WAIS-IV test results if they had access to the WAIS-III test results, as the ALJ's conclusion suggests.

report's findings that Kane performed best on verbal problem solving and "areas involving verbal information, such as analogies and comprehension, are a significant strength for her at this time." *See* (*id.* at 1194); *see also* (*id.* at 1196) ("Overall results suggest that Ms. Kane has a better ability for verbal reasoning (fund of knowledge and verbal comprehension tasks) over nonverbal (spatial processing and visual motor integration) tasks."). Thus, the ALJ's failure to articulate why Dr. Antonello's first report does clearly state that the results are accurate and why the Natalis report does not clearly state that the results are accurate prevents this Court from determining whether the ALJ's finding is supported by substantial evidence.

Third, the ALJ's finding that the Natalis test results be given no weight because Kane did not disclose her substance abuse to the examiners is not supported by substantial evidence. Importantly, Dr. Antonello was told in both the 2011 interview and the 2014 interview that Kane used various controlled substances including cannabis, cocaine, methamphetamines, and mushrooms. *See* (*id.* at 469, 481). At no point in either of his reports, however, did he raise concerns that this substance use could adversely impact Kane's test results. *See generally* (*id.* at 465–486). That is, there is nothing in the record to support the AJL's inference that had Kane accurately accounted for her substance abuse in the interview with the Natalis doctors that the Natalis report regarding the test results would have been different. Specifically, the ALJ identifies no record evidence that would support the conclusion that the Natalis doctors would have invalidated the test results had they been aware of Kane's substance abuse. Also, there is nothing in the record to suggest that Kane was under the influence of any of these substances during the testing performed by Natalis. Thus, the ALJ's finding that the Natalis test results should be given less weight because Kane was not forthcoming with respect to her substance abuse is not supported by substantial evidence in the record.

Finally, the ALJ's conclusion that the Natalis report be given no weight because the Natalis doctors did not specifically diagnose Kane with a cognitive impairment is not support by substantial evidence. As a threshold issue, the Court is unaware of any regulation or Eighth Circuit holding that requires a specific cognitive impairment to be diagnosed contemporaneously with an IQ score suggesting borderline or lower intelligence. That said, the Court also finds various places in the Natalis report that undermines the ALJ's factual finding more generally. For example, the Natalis doctors diagnosed Kane with "Unspecified Persistent Mental Disorders due to Conditions Classified Elsewhere." (*Id.* at 1211). In the Natalis report, the Natalis doctors opined that Kane's performance "suggests that Ms. Kane may struggle a great deal with her ability to organize and strategize her behaviors, and may be easily distracted, becoming quickly overwhelmed." (*Id.* at 1194). Furthermore, the Natalis Doctors opined that Kane "has profound cognitive difficulties." *See* (*id.* at 1207). At no point does the ALJ address the specific opinions of the Natalis doctors, instead opting to give the Natalis test results no weight as described elsewhere. That is, the ALJ does not appear to take issue with the Natalis doctors' specific opinions, only that the IQ score is not consistent with other record evidence.[10] *See, e.g.*, (*id.* at 20–21). As a result, the ALJ's conclusion that the Natalis doctors do not provide a specific cognitive impairment in conjunction with the test results is not supported by substantial evidence.

---

[10] In addition, to the extent the ALJ calls into question the Natalis report because the Natalis doctors rejected Kane's MMPI-2 test, this Court does not understand why rejecting a subjective MMPI-2 test (which is a self-reported assessment) has any bearing on the objective results regarding Kane's cognitive function, as the ALJ seems to imply. *See* (*id.* at 20); *see also* (*id.* at 1204) (stating that MMPI-2 is a self-reported assessment). If anything, rejecting subjective self-assessments in favor of the objective results should buttress those objective results. *Cf. Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) (stating "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary"). Regardless, the ALJ's lack of clarity here too prevents the Court from assessing whether substantial evidence supports the ALJ's conclusion.

At bottom, given the reasoning provided by the ALJ and the record evidence as a whole, this Court is concerned by the appearance that the ALJ substituted her judgment for that of the examining physicians, which is impermissible. *See, e.g.*, *Pate–Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009); *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990). To be clear, there may be justifiable and legally significant reasons for discrediting the Natalis report and the Natalis tests, but the ALJ has not adequately explained those reasons here.

Ultimately, this Court cannot determine whether substantial evidence supports the ALJ's findings that the WAIS-IV test administered by the Natalis doctors resulting in a full scale IQ score of fifty-seven should be given less weight than the either of the WAIS-III tests administered by Dr. Antonello resulting in full scale IQ scores of seventy-two and sixty-seven, respectively. Remand is required so that the ALJ may address these inconsistencies.[11] Furthermore, the Court notes that the ALJ's decision is silent regarding whether the onset of Kane's intellectual impairments initially manifested before age twenty-two, as required by the regulations. *See 2*0 C.F.R. Pt. 404, Subpt. P, App.1, § 12.05; *see also* (Admin. R. at 14–30). In light of the inconstancies in the record regarding Kane's IQ scores, it cannot be said that the ALJ's failure to make a finding regarding the onset of the intellectual impairment is harmless and this too warrants remand. *See Lott v. Colvin*, 772 F.3d 546, 550–52 (8th Cir. 2014). Finally, due to the identified inconsistencies, this Court cannot conclude from the record as a whole that

---

[11] The ALJ's finding in this regard is not harmless for the additional reason that the Natalis test results would satisfy Listing 12.05B's criteria of "[a] valid verbal, performance or full scale IQ of 59 or less." Thus, to the extent that ALJ's inconstancies prevent this Court from determining whether substantial evidence supports the ALJ's conclusion with respect to Listing 12.05C, these inconsistencies would also prevent a court from determination whether the ALJ's determination under Listing 12.05B was supported by substantial evidence as well.

substantial evidence supports a finding that Kane is disabled and entitled to benefits. Thus, to the extent that Kane seeks an award of benefits, that request is denied.[12]

## III. CONCLUSION

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Kathryn G. Kane's Motion for Summary Judgment [Doc. No. 17] is **GRANTED** as to remand and **DENIED** to the extent Kane seeks reversal for an award of benefits;

2. The Acting Commissioner of Social Security's Motion for Summary Judgment [Doc. No. 19] is **DENIED**; and

3. This case is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: July 23, 2018                                  *s/Steven E. Rau*
                                                     STEVEN E. RAU
                                                     United States Magistrate Judge

---

[12] While not raised by either party, this Court is also concerned with ALJ's lack of follow-up in the record with respect to Kane's GED. The record tends to show that Kane's GED was obtained through deceptive means. *See* (*id.* at 68–70, 89). The ALJ appeared to be concerned by this fact. *See* (*id.* at 69) (stating "[w]hoa, whoa, whoa, whoa. During the test?" in response to Kane's testimony that she called her mother for answers). But when the ALJ provided the Vocational Expert with hypotheticals, there was no question directed to whether the GED was a requirement for any of the jobs in which Kane could qualify for given her physical and mental impairments. Instead, the ALJ concluded that Kane "has at least a high school education," without addressing the inconsistencies in the record. *See* (*id.* at 29). While the Court does not remand for this issue, additional clarity in the record on this question is also warranted.